FRANKLIN et al. v. UNITED STATES.†

(Circuit Court of Appeals, Third Circuit. January 24, 1912.)

No. 1,560.

1. CRIMINAL LAW (§ 692*)—RECEPTION OF INCOMPETENT EVIDENCE—WAIVER OF OBJECTION.

Where testimony of handwriting experts was introduced and received without objection by both parties on a criminal prosecution, and afterward, on discovering that such evidence was inadmissible under the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied.

laws of the state, both proceeded without objection, they thereby waived all objection because of its admission.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1629; Dec. Dig. § 692.*]

2. CRIMINAL LAW (§ 692*)—RECEPTION OF INCOMPETENT EVIDENCE—SUBSEQUENT EXCLUSION OF LIKE EVIDENCE.

The fact that on a criminal prosecution both parties permitted the introduction of incompetent evidence without objection did not preclude the court from subsequently excluding similar evidence on objection duly made.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1629; Dec. Dig. § 692.*]

3. CRIMINAL LAW (§ 489*)—CROSS-EXAMINATION OF EXPERT—SCOPE.

Objections to the cross-examination of an expert handwriting witness as to certain photographic reproductions in his possession were properly sustained, where no reference had been made to such photographs in his testimony in chief.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1078; Dec. Dig. § 489.*]

4. WITNESSES (§ 277*)—CROSS-EXAMINATION—SCOPE.

Where, on a criminal prosecution, the question of defendant's animosity to a certain person was involved, it was pertinent to show on his cross-examination that his license as a court detective had been revoked after a judicial investigation brought about by an article published in a newspaper owned by such person.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 925, 979–984; Dec. Dig. § 277.*]

5. CRIMINAL LAW (§ 814*)—TRIAL—INSTRUCTIONS.

It was not error, on a criminal prosecution, to refuse to give a charge which would have drawn into the case confusing and immaterial issues.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1979–1985; Dec. Dig. § 814.*]

In Error to the District Court of the United States for the Western District of Pennsylvania.

Charles Franklin and Gilbert B. Perkins were convicted of using the mails in executing a scheme to defraud, and of conspiring to commit an offense against the United States, and they bring error. Affirmed.

Chas. A. O'Brien and W. H. S. Thomson, for plaintiffs in error.

John H. Jordan, U. S. Atty., and Robert M. Gibson, Asst. U. S. Atty.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below Charles Franklin and G. B. Perkins were jointly indicted for violations of sections 37 and 215 of the Criminal Code of the United States (Act March 4, 1909, c. 321, 35 Stat. 1096, 1130 [U. S. Comp. St. Supp. 1909, pp. 1402, 1455]); counts 1, 2, 3, and 4 being for placing or causing to be placed letters in a post office in executing a scheme to defraud,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and count 5 for conspiring to commit an offense against the United States. After a trial which lasted ten days the case went to the jury, who found the defendants guilty as indicted. On entry of judgment thereon the court imposed separate and different sentences on the defendants. Thereupon the defendants joined in a writ of error to this court. As no question is raised as to the propriety of this method of procedure, we refrain from any discussion of the question whether, in a criminal case, a single and joint writ of error will lie on the petition of two defendants upon whom separate and different sentences have been imposed. We here simply note the fact, lest our silence might hereafter seem to warrant the contention we had decided that question.

Passing, then, to the merits of the case, the evidence, all of which we have carefully examined, tended to show that on February 8, 1911, the mausoleum of the late Hon. William L. Scott, of Erie, Pa., was broken into and desecrated in an unsuccessful attempt to remove the remains of its occupants. The perpetrators have not been discovered. On learning thereof, Mrs. Annie W. S. Strong, who resided at Erie and was a daughter of Mr. Scott, at once telephoned a detective agency with which the defendants were connected, and which had, some two years before, done work for Mr. Strong, to come to Erie and take charge of the case. At the same time she sent word of the outrage to her sister and the trustee of her father's estate, both of whom lived elsewhere. In pursuance of her requests, Mr. Perkins arrived in Erie from his home in Pittsburgh on February 10th, and remained until February 18th, and Franklin from his home in Philadelphia on February 10th, and remained until February 13th. While in Erie both men stayed at the Reed House. They at once went to work on the case, having some ten men engaged upon it, and bringing bloodhounds to Erie from Indianapolis. Soon friction developed in the search for the perpetrators. Franklin had been at one time a licensed detective in Erie county, but through a legal investigation of the Erie county courts, which had been the outgrowth of an article concerning Franklin in a newspaper owned by the Strongs, his license was revoked. As a result of this, and of matters called to Mrs. Strong's attention by letter and report, she insisted, as soon as she learned of Franklin's employment, that he be dismissed from the case. In addition to this, the trustee of the estate had also employed another detective agency on the case, and its men declined to co-operate with the defendants.

The contention of the government was that the defendants, in order to continue their connection with the case, at once began working on the fears of Mrs. Strong for the personal safety of herself and family, by telling her she was in the hands of desperate men. If such course was pursued by Mr. Perkins—which course he wholly denied, as well as the use of language from which such inference could be drawn—it is certain the elements for working on Mrs. Strong's fears to a high tension existed. On Saturday night, February 11th, or Sunday morning, February 12th, a bullet was fired through

the window of Mr. Strong's office. On February 13th, Mr. Strong received by mail a letter, postmarked that day at Erie, which read:

> P. S. or your house will be blown up.
> Mr. Strong
>     Leave $50,000
>     at 31" st and
>         Pennsylvania
>         Ave
>     on night of Feb.
>     29" at 12 P. M. or you will **have**
>     your mausoleum
>     blown up and
>     if you bring any
>     police on 29th of Feb.
>     my men will shoot
>     them.
>         Black Hand

This was followed on February 15th by a second as follows:

>         C. Strong.
>     You leave $50,000
>     at 11 P. M. Feb. 28, 1911
>     at 31 st ant Pennsilvanea
>     Avenue or you will have
>         your branes
>     blowed out. Either you
>     or your wife. If you
>     brung eny police along
>     hey will be shot and
>     my men will take a
>     strong battle.
>     (You
>     (son-of-a-b——)  Black Hand
>             Deth

The first four counts in question are based on the mailing, etc., of these letters. They were followed on February 23d by one addressed to the chief of police of Erie, as follows:

>         Cheef of Police.
>     Dont you dare
>     to send any police
>     to 31" st Pennsylvania
>     Ave on night of Feb. 28
>         at 11 P. M.
>     as your men
>     and mie men will
>     have a pitched
>     battle.
>     We demanded $50,000
>     from Strongs
>             Black Hand
>         deth

In support of its contention the government called Mrs. Strong, who testified that on the morning of February 13th (which was the date of the first black hand letter) Mr. Perkins—

"asked me if I had had any threatening letters. I said, 'No.' 'Well,' said he, 'You will have them; they will come.' I said, 'I hope not.' 'Well,' he

said, 'this is a desperate case, Mrs. Strong. This entire thing is a desperate case, and you will have some letters.' "

She also testified that after the first letter was received he said:

" 'Mrs. Strong, did you notice how that letter is torn?' I said, 'Yes.' He said: 'The probabilities are that you will get another letter that was written on a piece of paper that fits into that exactly. It is to show you that it is the same people and that they mean business. They are desperate.' "

She further testified:

"Mr. Perkins from the very first tried to impress upon me that the thing was of the most serious character, that the people connected with it must be enemies, that I had enemies, that it was done to show me I had, and they were desperate, and they intended to go on with it, and this letter in other words proved to him this state of affairs."

Mr. Strong testified that after the first letter came Mr. Perkins called his attention to its torn edge, and said that it had—

"apparently been shaped in that way for the purpose of identifying it to the corresponding piece, which would be found later on when the writer was discovered."

Mr. Walker, Strong's secretary, said Mr. Perkins showed him the letter of the 13th on February 15th, and—

"he commented on the general character of the letter—the way it was torn —and said we would probably get another letter. The other letter would probably be the other half of this paper—would fit right in—and the possibility, if the writer of the letter was the desecrator of the mausoleum, we would receive a piece of copper with it."

There was also testimony by Mr. Sobel, the postmaster at Erie, that Mr. Perkins visited him, told him some threatening letters would likely come, and suggesting the carriers be put on guard so as to locate the mailing place; that Mr. Perkins subsequently brought him the first black hand letter received; and that witness examined it and called Mr. Perkins' attention to the fact that several words which would be misspelled by an illiterate person were correctly spelled, and that in the second black hand letter subsequently received some of these particular words were misspelled. He also said that Perkins called his attention to the uneven edges of the paper on which the first letter was written, and that he expected to find the corresponding piece in the writer's possession when he was caught.

Two witnesses testified to Mr. Franklin's hostile feeling toward the Strongs, and it was shown that on the night of February 22d, the day before the letter to the chief of police was mailed, Mr. Perkins had been again in Erie. It further appeared that the United States postal authorities had investigated the mailing of these letters, and on April 13th simultaneously caused the arrest of Mr. Perkins at Indianapolis and Mr. Franklin in Philadelphia. On his arrest Mr. Perkins was requested to hand over his personal effects, and among others was a large envelope which he took from his pocket and gave to a deputy marshal. Later Mr. Perkins asked that the envelope be returned, saying it only contained a codicil to his will. The envelope and papers were, however, placed in a large official envelope and

sealed; the explanation being made to Mr. Perkins that as soon as the papers taken were examined they would be returned to him.

The search of the offices having been made under a search warrant issued by the state courts, the post office inspectors became apprehensive that legal proceedings would be taken in Indianapolis to recover the papers, and they at once left for Columbus, Ohio, taking them with them. Here they broke the seal of the official envelope, and in the large envelope received from Perkins they found, among others, a sealed envelope having printed on it the name of the Reed House, Erie, Pa. On opening this there were alleged to be found torn fragments of sheets of paper, which were produced at the trial, and which tallied with the two black hand letters received by Mr. Strong. In the meantime Mr. Franklin had been requested to come to the office of a post office inspector in Philadelphia. He there, on inquiry by the inspector, gave an account of his connection with the Scott case at Erie, and at his request wrote copies in pencil and ink of the black hand letters. Thereafter the post office authorities caused Franklin's arrest as being the writer of these letters. Testimony tending to prove these facts, with others, was given by the government.

On the part of the defendants, who went on the stand, there was a denial in whole of the writing or mailing of the letters, or of any knowledge of them, and a most explicit denial by Mr. Perkins of ever having had in his possession the alleged incriminating fragmentary papers, and of any statements alleged to have been made to Postmaster Sobel and Mrs. Strong tending to show predictions by him that black hand letters would be forthcoming.

The case was submitted to the jury in a full and fair charge, to which no complaint, save one hereafter noted, is now made. The assignments of error bring before us for review certain rulings in regard to the admission of evidence, and to the correct understanding of which we are compelled to refer to further details of the conduct of the case.

[1] On the trial, the government having given in evidence the alleged black hand letters laid in the indictment, and submitted the copies thereof made by Franklin, then called two experts in handwriting, who were examined and cross-examined by the respective parties at great length. These men gave as their opinion that the same man had written both. On their side, the defendants called four handwriting experts, who were likewise examined at length by both sides, and who testified to a contrary conclusion. The testimony thus adduced by both sides was received without objection or exception, and is not now assigned for error. In the course of the trial it subsequently developed that this whole line of expert testimony given by both sides was open to objection. The case of United States v. Hughes, which was decided in 1892, but only recently published in 175 Fed. 238, held that the law of Pennsylvania, as it existed at the passage of the judiciary act of 1789, governed the admission of testimony in criminal trials in United States courts held in that state. While the law of Pennsylvania has now been changed by the act of 1895 (P. L. 69), and the decisions of its courts (Groff v. Groff, 209

Pa. 603, 59 Atl. 65; Shannon v. Castner, 21 Pa. Super. Ct. 294), yet prior thereto, experts were not permitted to make comparisons of handwriting and to testify to their conclusions therefrom (Travis v. Brown, 43 Pa. 9, 82 Am. Dec. 540; Foster v. Collner, 107 Pa. 305).

The validity of an objection to the testimony of these experts having come to the knowledge of the parties to this suit before the case was ended, it was open to either one to call the attention of the court to the matter and have the question determined whether the case should go no further, or to ask that the evidence be ruled out and the jury instructed to disregard it (Russell v. Shurmeier, 9 Minn. 28 [Gil. 16]), or to proceed in the case without objection to the testimony. This latter course was pursued by both parties, and thereby all objection to such testimony was waived, on the principle stated in Broom's Legal Maxims, 112, 2 Inst. 123:

"'Consensus tollit errorem;' the acquiescence of a party who might take advantage of an error obviates the effect."

For as there said:

"On the maxim under consideration depends also the important doctrine of waiver; that is, the passing by of a thing—a doctrine which is of wide application both in the science of pleading and in those practical proceedings which are observed in the progress of a cause from the first issuing of the writ to the ultimate signing of judgment and execution."

Nor is the doctrine of waiver confined to civil causes; for as Broom further says (page 114):

"Therefore, if a party, after a proceeding which, by insisting on the irregularity, he might have prevented, he waives all exception to the irregularity. This is a doctrine long established and well known, and extends so far that a person may be materially affected in a subsequent criminal prosecution by proceedings to the irregularity of which he has, by his silence, waived objections."

It will thus be seen that by the conduct of both parties the case is to be considered, as to such objected-to testimony, as if there had been no irregularity in that regard.

[2] At a later stage of the case, and when the legal inadmissibility of such testimony was known by all parties, the defendants' counsel offered seven reports, styled Exhibits 5 to 10, inclusive, signed by Franklin, to his agency—

"as standards for the purpose of enabling the experts, in connection with the standards offered by the government, to make comparison between the writing of Franklin and the black hand letters in question."

To these the government objected as incompetent for the purpose stated, and further for the reason that—

"the evidence showing that these reports were sent in daily for a period of over a year and a half, and these selections only being within a limited space, from the 12th to the 19th of April, 1910, that they bear the appearance of special selections, and would therefore be self-serving papers."

At the argument of this case at bar it was said that at the time this objection was made it had then been stated by counsel for the government that no objection would be made to the admission of these

five reports, if all the reports were offered. This suggestion was evidently considered by the counsel for the defendants overnight, for the record then shows:

"Counsel for defendants withhold the offer until morning."

The record for the next day shows no further action taken, or renewal by defendants' counsel of the withheld offer; but the court, possibly overlooking that fact, proceeded at once on the opening of court to sustain the objection to its admissibility, along with some other offers the court had been considering. In sustaining this objection, as we have seen from the authorities quoted, the court committed no error, for the testimony to be adduced by experts from such writings was clearly inadmissible in a criminal trial in the United States criminal courts in Pennsylvania. The prior action of both parties in permitting such testimony to go to the jury without objection in no way precluded the court, when objection was made, from ruling upon such objection according to law. If the exclusion of such testimony, in view of other testimony of the same nature having been already received, placed the defendants in an unfair position, or if the objection by the government to this testimony, in view of testimony of the same character being already in, was unfair or ungracious, it was open to the defendants, as we have already seen, to ask the court to exclude all testimony of that character from the jury. But, instead of doing so, they proceeded thereafter to examine four handwriting experts, to whose testimony the government made no objections, to combat the testimony of the two experts the government had called.

It will be observed that the testimony of experts to make handwriting comparisons is admissible in many jurisdictions, indeed, is now so in Pennsylvania, so that this is not a case where the verdict is based on testimony which is violative of fundamental criminal principles. Indeed, criminal trials in the federal courts of Pennsylvania have come to our knowledge where expert testimony of this kind, but without objections, was given by both sides. We are therefore led to believe that in this case the experienced counsel of the defendants were so well satisfied of the correctness of the views of their experts, who were twice in number those on the government's side, that they were content to let such testimony go to the jury. Finding, then, as we do, that the court committed no error in rejecting this testimony when and as offered, it follows that it committed no error in excluding specimens of the handwriting of one Dempsey, offered by the defense—

"as standards of the normal handwriting of said Dempsey, to be followed by expert witnesses, who will testify that by a comparison between the standards and the black hand letters in question they were written by the said Dempsey."

[3] Assignment of error is also made to the court's sustaining objections to the cross-examination by defendants' counsel of Pengelly, an expert handwriting witness of the government, as to certain photographic reproductions of the black hand letters which he had in his

possession. As no reference had been made in any way to such photographs by the witness in his testimony in chief, the court properly excluded cross-examination on that subject. Not only is this the case, but we see no way in which—if these photographic reproductions had been produced—they could have affected the issue.

[4] The next assignment was to the court's permitting the defendant Charles Franklin, on cross-examination, to be asked if his license as a court detective of Erie county had not been taken from him. We find no error in this regard. The scope of cross-examination of a defendant who goes upon the stand may take, in the discretion of a trial judge, considerable latitude. We cannot say that latitude was here exceeded. The question of Franklin's animosity toward the Strongs, who had insisted on his being retired from the work, was involved in the case, and cross-examination which tended to show that his license had been revoked after a judicial investigation brought about by an article published in a newspaper owned by Mr. Strong was pertinent, in connection with other proven expressions of his feelings toward them, as showing animosity against them.

[5] In its answer to the defendants' request the court affirmed the defendants' point:

"That post office inspectors and all other federal officers called as witnesses for the government are subject to all the ordinary rules and methods for testing the accuracy, recollection, and veracity of other witnesses in the trial of a cause in the United States court, and the credibility of all of the witnesses in a case is a question solely for the jury."

It is contended, however, the court should have gone further, and affirmed the defendants' point that:

"Under the federal Constitution and laws, a United States post office inspector has no right or authority to obtain or use a search warrant, to search the premises or person of any citizen, for the purpose of obtaining or seizing private letters or papers as evidence against the person searched. Nor has such officer the right or authority to obtain or use a state search warrant to aid in such search, and the search of the premises and person of the defendant Gilbert B. Perkins, testified to by witnesses for the government in this case, was unlawful, and the jury have the right to consider this as bearing upon the credibility of such witnesses as were engaged therein."

We do not think the court was obliged to affirm this point. It was founded on a misconception. The post office inspectors had not obtained any search warrant, and the trial court was certainly not called on to express any opinion as to the validity or effect of a state search warrant, which the local police authorities were said to have had, but which was not in evidence in this cause. Indeed, we fail to see what bearing the legality or illegality of any alleged search had to do with the case on the defendants' theory, which was that the search had resulted in the seizure of no incriminating testimony, that the envelope found on Mr. Perkins' person was voluntarily and freely handed over by him, and that it did not contain the alleged fragmentary incriminating papers. The affirmance of this point would have drawn into the case confusing and immaterial issues, and the mind of

the jury was properly withdrawn from them by the court in its charge —and in such language there was no error—as follows:

"I must call your attention to a matter which has been commented upon at some length by counsel, and that is with respect to the methods adopted by those who arrested the defendants and searched and seized their persons and property. It is not for this court and jury to determine whether those methods were or were not unlawful acts. If they were unlawful searches and seizures of person and property, the remedy is not in this trial. The issue here is whether the defendants, or either of them, are guilty of, or conspired to commit, the offense against the United States as charged in the indictment."

In conclusion, we deem it proper to say that, after a careful examination of the entire record, the whole of the testimony, and a study of the briefs of counsel, we find no error to justify our disturbing this verdict and the judgments of the court thereon.

They are therefore affirmed.